FILED
John E. Triplett, Clerk of Court
United States District Court
By jburrell at 11:36 am, Nov 12, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JAMES E. PARKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action File No. 4:21cv-328 |
| | ) |
| LUMMUS CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT & DEMAND FOR JURY TRIAL**

COMES NOW, JAMES E. PARKER, plaintiff in the above-styled civil action, and files this complaint against LUMMUS CORPORATION, defendant, as follows:

1. This action is brought for violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the common and statutory law of the State of Georgia.

2. Jurisdiction is founded upon 28 U.S.C. §§1337, 1343(3), 1343(4) and the aforementioned statutory and constitutional provisions. This court is also permitted to exercise pendent jurisdiction over plaintiff's state law claims, if any.

3. As will be outlined hereinafter, all matters herein alleged occurred within the federal judicial district of the Southern District of Georgia and further within that division of said District known as the Savannah Division.

4. Plaintiff James E. Parker is a caucasian male citizen of the United States and resident of the State of Georgia. Mr. Parker was born on May 8, 1955. At the time of his termination, Mr. Parker was sixty-five (65) years of age.

5. Defendant Lummus Corporation is a Foreign for-Profit Corporation registered to do business in the State of Georgia, bearing Control No. K306581 before the Georgia Secretary of State, and having its principal office in Georgia at 225 Bourne Boulevard, Savannah, Georgia 31408.

6. Defendant Lummus Corporation may be served by way of its registered agent, Corporation Service Company, at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that in that a substantial part of the events giving rise to Plaintiff's claims occurred in this district, 28 U.S.C. § 1391(b)(2), Defendant is subject to personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

8. Plaintiff was employed with Defendant or its predecessor corporation(s) from May 31, 1988, until March 31, 2021.

9. In 1992, Plaintiff's became Defendant's "Credit Manager," which included responsibility for customer accounts receivable, customer credit and debit administration, and preliminary collections work with respect to past due accounts; however, in or around 2000, and until the date of his termination, Plaintiff also had primary responsibility for domestic and export logistics.

10. In his logistics role, Plaintiff arranged all flatbed trucks and vans for shipments out of Defendant's facilities in Savannah, Georgia, and other locations, booked and administered Defendant's export shipments with ocean and air freight forwarders, including preparation and administration of all required export documentation, and

coordination of shipping container deliveries, customs and inspections, and recorded and disseminated freight quotes to Defendant's sales department in order for the sales representatives to quote competitive freight rates to Defendant's customers, among many other duties and responsibilities.

11. Plaintiff was an exemplary employee for the duration of his employment. He was well-respected by his peers and managers. He was widely recognized as the "go to" subject matter expert at Defendant's company for credit management, accounts receivable and logistics. He was responsible, trustworthy and accountable. He was regularly lauded in management meetings and during employee reviews for his aptitude, attitude, diligence and experience. He was a team player, with no history of workplace conflict or controversy. In fact, for all of these reasons, when management determined to terminate Plaintiff as part of a campaign to purge Defendant of older white males, Plaintiff's immediate supervisors defended Plaintiff's substantial institutional knowledge, maturity, experience, dedication, hard work and consistently excellent job performance to no avail. Defendant instructed Plaintiff's supervisors to terminate him without regard to his exceptional credentials or job performance.

12. In February 2020, Defendant's Chief Financial Officer, David Dudding, requested Plaintiff to attend a lunch meeting. Mr. Dudding travelled from his office in Louisville, Kentucky, to attend the lunch meeting. Mr. Dudding did not customarily visit or conduct business in the Savannah facility.

13. During the lunch meeting, Mr. Dudding requested Plaintiff to consider working part time and reduce the scope of Plaintiff's duties to logistics only.

14. Believing that he was an essential worker with respect to credit management and other critical duties, Plaintiff expressed surprise regarding Mr. Dudding's request and Plaintiff asked Mr. Dudding if Mr. Dudding knew what roles Plaintiff performed for Defendant. Mr. Dudding responded that Plaintiff was a logistics manager. When Plaintiff described the full scope of his job responsibilities, Mr. Dudding admitted to Plaintiff that the real purpose of the proposed reduction to part time, including more limited services, was to make way for Plaintiff's replacement in light of Plaintiff's advanced age and essential services. Mr. Dudding asked Plaintiff when he would reach retirement age. Plaintiff answered that he had no plans to retire, however, Plaintiff was, at that time, sixty-four (64) years old, and Plaintiff would reach the full retirement age of 66 years and 2 months in July 2021. Mr. Dudding also asked Plaintiff if he was on Medicare. Plaintiff responded that he was not on Medicare and that he was covered by Defendant's health insurance program. Mr. Dudding requested Plaintiff to reduce his hours to part time and the scope of his employment to logistics only. Mr. Dudding told Plaintiff to consider Mr. Dudding's recommendation and get back to him.

15. Plaintiff told his boss, Laura Snellgrove, about the meeting. Ms. Snellgrove told Plaintiff that she was not aware of the meeting with Mr. Dudding and had no idea what initiated Mr. Dudding's comments. Ms. Snellgrove complimented Plaintiff on his exceptional job performance and wished out loud that Plaintiff would remain employed in his current role for as long as possible.

16. Following that, Ms. Snellgrove confronted Mr. Dudding regarding his plans for Plaintiff. Mr. Dudding told Ms. Snellgrove that, in connection with Defendant's plans to reduce headcount, the company would eliminate two positions

within her department, including Diane Gross, a female accounts receivable clerk who was approximately 72 to 74 years of age, and Plaintiff. Ms. Snellgrove requested Mr. Dudding to keep Plaintiff, stating that Plaintiff was her "right hand person." Mr. Dudding defended the company's position, stating that Plaintiff was nearing retirement age and probably ready to leave. Ms. Snellgrove responded that Plaintiff had never mentioned retirement to her and she needed Plaintiff's services and experience to run her department. Mr. Dudding concluded the conversation with Ms. Snellgrove by telling her that the Defendant had already made its decision to terminate Plaintiff without consulting her, and there was nothing left to do.

17. A few weeks later, in March 2020, Mr. Dudding resigned his employment with Defendant Lummus Corporation. Plaintiff asked Ms. Snellgrove whether he needed to do anything further regarding Mr. Dudding's recommendation, and Ms. Snellgrove responded that Plaintiff should keep on working as usual.

18. In March 2020, Defendant Lummus Corporation hired a new CFO, Will Kutcher.

19. On April 6, 2020, Will Kutcher requested a meeting with Plaintiff in Mr. Kutcher's office.

20. When Plaintiff arrived at Mr. Kutcher's office, Mr. Kutcher and Ms. Snellgrove were in attendance. Mr. Kutcher started the meeting by announcing that "I hate days like this." Mr. Kutcher said that he was aware of Plaintiff's meeting with David Dudding. Mr. Kutcher notified Plaintiff that, because Defendant's actual and prospective sales were down as a result of the COVID-19 pandemic, effective that day, April 6, 2020, Plaintiff's would commence working only 32 hours per week, Plaintiff's

job responsibilities would be limited to logistics, and Plaintiff's last day with the company would be May 31, 2020.  Plaintiff complained that his elimination date was earlier than his full retirement age, that Plaintiff would suffer economic harm as a result of such termination, that Plaintiff's various roles were essential to Defendant's operations, and that Plaintiff was regularly lauded for being Defendant's critical subject matter expert with respect to his various roles (*e.g.,* logistics, credit management, rate setting and invoicing).  Plaintiff asked Ms. Snellgrove if she agreed with Defendant's action, to which she replied: "No."  Plaintiff stated that he would continue to perform all of his regular duties or else Laura's department would suffer.  Laura replied: "Thank you." When Plaintiff departed the meeting, he was confused regarding the impetus for his reduction in hours and job elimination, and hopeful that his boss, Ms. Snellgrove, would correct the situation.

21. On Friday, May 15, 2020, Ms. Snellgrove notified Plaintiff that, following the resignation of one of Defendant's senior accountants, Mr. Kutcher may request Plaintiff to stay longer than May 31, 2020.

22. On Tuesday, May 19, 2020, Mr. Kutcher called Plaintiff into Mr. Kutcher's office, acknowledged the senior accountant's resignation, and requested Plaintiff to continue working until the end of 2020.  Plaintiff replied that he would think about it.  Mr. Kutcher said that it would help him and the company very much if Plaintiff would stay through the end of the year, and that Mr. Kutcher would appreciate Plaintiff's cooperation very much.  Plaintiff reiterated that he would think about it.

23. On Thursday, May 28, 2020, Plaintiff met with Mr. Kutcher and Ms. Snellgrove.  Plaintiff expressed his bewilderment regarding Defendant's mixed messages

– that, on the one hand, Defendant was terminating Plaintiff due to pandemic-related reductions and restructuring, but, on the other hand, Defendant now desperately needed him to stay to perform essential job functions for which he was uniquely qualified and experienced. Defendant reiterated that he did not want to work part time, and had no plans to retire. Mr. Kutcher reinforced Defendant's position that Plaintiff's duties would not be needed beyond the end of 2020, but Defendant would really appreciate Plaintiff's continuing assistance until then. In response, Plaintiff inquired whether Defendant would, instead, extend Plaintiff's employment until July 8, 2021, in order for Plaintiff to achieve full social security retirement benefits. Mr. Kutcher ended the meeting saying he would get back to Plaintiff regarding his request, but, in the meantime, Plaintiff should continue his job responsibilities as before.

24.   On Friday, May 29, 2020, Mr. Kutcher informed Plaintiff that Defendant could not wait until July 2021 to execute the planned layoffs and eliminations, and "the best the company could do was extend Plaintiff's job until March 31, 2021" or words to that effect. When Plaintiff reiterated that he would lose valuable retirement benefits if not employed through July 8, 2021. Mr. Kutcher reinforced Defendant's position that Plaintiff's job would be eliminated by March 31, 2021, without exception, however, Mr. Kutcher added that if Plaintiff would agree to work until then, Defendant would pay Plaintiff a bonus in the amount of $2,500.00.

25.   Based on Defendant's unequivocal advice regarding the prospective layoffs and eliminations, Plaintiff reluctantly agreed to work until March 31, 2021.

26.   On June 12, 2020, Laura Snellgrove resigned her employment with the Defendant.

27. In July 2020, Keith Ellis replaced Ms. Snellgrove as Defendant's controller and Plaintiff's boss.

28. In or around August, 2020, Defendant hired a "Logistics and Warehouse Manager," located at Defendant's Savannah facilities. Upon information and belief, the new employee was a 50 year old white male. Mr. Ellis advised Plaintiff that the new employee would be taking over all of Plaintiff's logistics duties. Plaintiff was ordered to train the new employee in order for the new employee to take over all of Plaintiff's logistics responsibilities by the end of the year.

29. Shortly before Plaintiff's alleged job elimination, on or about March 22, 2021, Defendant hired a 29 year old white male to take over all of Plaintiff's credit management, accounts receivable, customer credit and debit administration, and related accounting duties.

30. On Plaintiff's final day of employment, March 31, 2021, Plaintiff discussed his termination with Defendant's CFO, Will Kutcher. Plaintiff inquired why Plaintiff's job was allegedly eliminated as a result of the pandemic when Defendant's recent hiring practices—i.e., hiring not one but *two* new salaried employees to replace Plaintiff—indicated otherwise. Mr. Kutcher stated that Defendant had to eliminate jobs and reduce headcount due to economic conditions caused by the pandemic.

31. Keith Ellis resigned from his employment with Defendant on April 2, 2021. On Thursday, April 29, 2021, Mr. Ellis confessed to Plaintiff that Mr. Ellis was ordered to hire Plaintiff's replacement although he disagreed with it. Mr. Ellis admitted that he was very uncomfortable with the manner in which Defendant terminated Plaintiff – that is, that Defendant hired a much younger person to perform Plaintiff's job functions

and ordered Plaintiff to train his replacement, without any apparent legitimate basis for such action and despite Plaintiff's excellent qualifications, experience and performance. Mr. Ellis also admitted that when he asked his superiors why they decided to terminate Plaintiff several times, they could not or would not give him a reason.

32. Plaintiff subsequently learned that Plaintiff was terminated and replaced Plaintiff as part of a campaign to purge older white males from its workforce.

33. Specifically, Defendant's Human Resources director, Heather Cheek, admitted to Paul Durham, former HR Manger for Defendant, and others that (i) too many employees were "pale, male, and stale," and (ii) Defendant directed Ms. Cheeksto eliminate "pale, male, and stale" employees, such as Plaintiff.

34. After hearing Ms. Cheek's statements regarding eliminating "pale, male and stale" employees on multiple occasions, Paul Durham, former HR Manager for Defendant, twice reported Ms. Cheek's comments to Defendant's Chief Operating Officer, Julian Young, and Defendants President of Manufacturing, Russell Sutton. Mr. Durham admonished Messrs. Young and Sutton that Ms. Cheek's comments and directions could cause Defendant legal troubles and Mr. Durham requested their attention and assistance regarding same.

35. Upon information and belief, Mr. Young, Mr. Sutton and the Defendant did nothing in response to Mr. Durham's information and advice.

36. Within one week of Mr. Durham's conversation with Messrs. Young and Sutton described above, Defendants terminated Mr. Durham by urging him to resign with two (2) weeks of severance pay.

37. Upon information and belief, in or around the time that Plaintiff was terminated, Defendant terminated several other older workers without cause as part of Defendant's campaign to eliminate older workers.

38. Upon information and belief, in connection with its campaign to eliminate older workers, Defendants intentionally modified job postings in order to artificially change the credentials, duties and terms of employment applicable to such jobs so as to avoid age discrimination claims.

39. Upon information and belief, in or around the time that Plaintiff was terminated, Defendant ceased certain record-keeping regarding older employees on the advice of Defendant's Vice President of Human Resources, who admitted that such record-keeping would soon be superfluous due to Defendant's planned terminations of older workers.

40. Defendant's alleged bases for Plaintiff's termination were bogus, pretextual and contrived to support Defendant's campaign to remove older white males from its workforce.

41. Plaintiff is a member of a protected class (40 years of age or older).

42. Defendant took an adverse employment action against Plaintiff by terminating his employment.

43. Plaintiff was qualified for the credit management, logistics and accounting roles, in which he had faithfully served Defendant for 32 years and ten months, and from which roles he was terminated without cause.

44. Plaintiff was replaced by one or more new employees who were significantly younger than Plaintiff.

45. There was no legitimate, nondiscriminatory reason for Plaintiff's termination.

46. Plaintiff filed a Charge of Discrimination against Defendant Lummus Corporation with the United States Equal Employment Opportunity Commission (the "EEOC") on August 11, 2021, bearing EEOC Agency Charge No. 415-2021-01043, and attached hereto as Exhibit A.

47. On August 16, 2021, the EEOC issued Plaintiff a Notice of Right to Sue for filing a private lawsuit against Defendant Lummus Corporation within ninety (90) days following Plaintiff's receipt of said notice. A copy of the EEOC Right to Sue Notice is attached hereto as Exhibit B.

48. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under the ADEA.

49. This action is timely filed within ninety (90) days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

## COUNT ONE

### DISCRIMINATORY TERMINATION BASED ON AGE IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT 29 U.S.C. §§ 12201 ET SEQ.

50. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

51. Upon firing Plaintiff, Defendant replaced him with one (1) or more employees who are substantially younger than Plaintiff and have lesser qualifications and experience regarding Plaintiff's job functions than Plaintiff.

52. Upon firing Plaintiff, but before the date of termination, Defendant required Plaintiff to provide job-training to one or more of the individuals hired to replace Plaintiff.

53. Plaintiff suffered damages as a result of Defendant's unlawful discriminatory actions, including past and future lost wages and benefits, and the costs of bringing this action.

54. Defendant willfully violated Plaintiff's rights under the ADEA and, as a result, in addition to the foregoing damages, Defendant is liable for liquidated damages in an amount equal to one (1) times Plaintiff's past and future lost wages and benefits, 29 U.S.C.A. § 626.

55. Plaintiff is entitled to reasonable attorney's fees and costs associated with bringing this action.

WHEREFORE, plaintiff prays that:

a) The Court accept jurisdiction over this matter;

b) Process issue and Defendant be served with a summons and a copy of this lawsuit in accordance with the Federal Rules of Civil Procedure;

c) Plaintiff have a jury trial on the issues presented herein;

d) The Court award Plaintiff damages for his past and future loss of wages and benefits, plus interest;

e) The Court order Defendant to reinstate Plaintiff to a position comparable to his former position or, in lieu of reinstatement, award him front pay (including benefits);

f) The Court award to Plaintiff liquidated damages incurred in connection with this action;

g) The Court award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action; and

h) The Court grant Plaintiff such additional or alternative relief as the Court deems just and proper.

Respectfully submitted this  11  day of  November            , 2021.

/s/ Bill Glass
Bill Glass, Esq.
Georgia Bar No: 297340
Ellis Allen, Esq.
Georgia Bar No. 318449
Attorney for Plaintiff

WEINER, SHEAROUSE, WEITZ,
GREENBERG & SHAWE, LLP
P.O. Box 10105
Savannah, Georgia 31412
(912) 233-2251